**<u>REPORTED</u>**

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 1620

September Term, 2014

---

JOVAN MAURICE BRICE

v.

STATE OF MARYLAND

---

Woodward,
Hotten,
Sharer, J. Frederick
    (Retired, Specially Assigned),

    JJ.

---

Opinion by Woodward, J.

---

Filed: November 25, 2015

Jovan Maurice Brice, appellant, was arrested on August 2, 2011, and charged with illegal possession of a regulated firearm. On July 18, 2014, appellant was convicted of that charge after a jury trial in the Circuit Court for Harford County. Thereafter, appellant was sentenced to five years in prison, with all but three years suspended and five years of supervised probation.

On appeal, appellant presents four questions for our review, which we have slightly rephrased:

1. Did the trial court err in refusing to ask, during *voir dire*, the police witness questions?

2. Did the trial court err in permitting the admission of testimony about an alleged prior bad act?

3. Was the evidence sufficient to sustain the conviction?

4. Was there probable cause for a traffic stop for a violation of Section 21-604 of the Transportation Article?[1]

We conclude that the trial court erred in refusing to ask the police witness questions and, accordingly, reverse the judgment of the circuit court. Because we answer question three in the affirmative, we will remand the case for a new trial. For the guidance of the trial court on retrial, we shall address the remaining questions.

## BACKGROUND

On August 2, 2011, appellant was charged with illegal possession of a regulated

---

[1] In his brief, appellant phrased this question as: "Was there reasonable articulable suspicion for a traffic stop for a violation of Md. Code, Transp. Art. 21-604, where the State failed to present any evidence that any vehicle would have been affected by [a]ppellant's turn made without a turn signal?"

firearm. Prior to trial, on June 6, 2012, appellant filed a motion to suppress the evidence obtained as a result of a traffic stop. The circuit court held a hearing on appellant's motion that same day. At the hearing, Deputy Keith Jackson of the Harford County Sheriff's Office testified on behalf of the State. Deputy Jackson testified that, on the evening of July 21, 2011, he was conducting surveillance of a gas station. The surveillance was in response to a series of recent robberies that had occurred at local gas stations. Deputy Jackson observed appellant, who fit the description of the robbery suspect, pull up to the gas station in a Cadillac. When appellant exited the convenience store at the gas station, he paused by the door and looked around for a few seconds. This behavior seemed odd to Deputy Jackson, so he followed appellant as he drove away from the station.

Deputy Jackson followed appellant's car for approximately five to six minutes, at which point appellant made a right hand turn from Main Street to Courtland Street without using a turn signal. At the time appellant made the turn, Deputy Jackson was directly behind him at a distance of about one car length. Appellant's turn "kind of took [Deputy Jackson] off balance." Deputy Jackson then activated his emergency equipment and conducted a traffic stop.

Deputy Jackson approached the vehicle and saw that appellant was the only occupant. He asked appellant for his license and registration, which appellant produced. At that time, Deputy Greg Jordan and Colonel Javier Moro arrived on the scene as backup. Deputy Jackson returned to his vehicle to run appellant's information while the other officers remained with appellant. While running appellant's information, Deputy

2

Jackson noticed the other officers begin to close in on appellant. Deputy Jackson stopped his investigation and went to assist them. Appellant was taken out of the car, placed in handcuffs, and seated on the shoulder of the road. The officers conducted a search of the vehicle and then released appellant with a traffic warning.

A jury trial was held from July 16, 2014 through July 18, 2014. Deputy Jackson took the stand and testified to the same general information that was presented at the suppression hearing with a few additional details. He testified that, when the search of appellant's vehicle was conducted, Deputy Jordan found a clear sandwich baggie under the driver's seat that contained a metallic handgun magazine. Colonel Moro testified that he was one of the two officers who came to assist Deputy Jackson during the traffic stop of appellant. Colonel Moro stated that he had removed appellant from the car because Deputy Jordan saw appellant "making some movements."

Deputy Gregory Young then testified that Deputy Jackson told him about appellant's traffic stop during a lunch conversation. As a result of this information, Deputy Young initiated a firearms investigation into appellant. An online case search indicated that appellant had two convictions from 2002 and 2006 for possession of a controlled dangerous substance (not marijuana). Deputy Young decided that a search and seizure warrant should be obtained for appellant's residence based on that information.

On the morning of August 2, 2011, the Special Weapons and Tactics team entered and searched appellant's apartment pursuant to a search warrant. Appellant was the only person present inside the apartment. During the search, a Lorcin .380-caliber handgun was found inside the pocket of a jacket hanging in appellant's closet. Officers also found

3

a box of 9mm Browning cartridges and a pistol magazine with eight live cartridges. Deputy Young testified that the firearm recovered was classified as a regulated firearm. He further testified that anyone convicted of a charge that carries a statutory penalty of more than two years is prohibited from possessing a regulated firearm. The statutory penalty for each of appellant's two previous convictions of possession of a controlled dangerous substance (not marijuana) was four years.[2]

Appellant was advised of his *Miranda* rights and indicated that he understood his rights and would speak to the investigators. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Special Agent Alan Boroshok testified that he and Agent Anthony Tolomeo conducted an interview with appellant during the search of his apartment. Appellant told the agents that he received the pistol magazine from his cousin in 2004 and bought the ammunition at Walmart. According to Agent Boroshok, appellant said "that he acquired the handgun from what he termed a junkie in the White Marsh area. [Appellant] made a trade for an eight ball of crack cocaine for it." Appellant told Agent Boroshok that he had the gun for seven years, but had never actually shot it. Appellant admitted that he had wiped down the gun.

On July 18, 2014, appellant was convicted of illegal possession of a regulated firearm. On September 23, 2014, appellant was sentenced to five years of incarceration,

---

[2] Officer Young testified that the statutory maximums for appellant's two convictions of possession of a controlled dangerous substance were three years and four years, respectively, but the maximum for both offenses was actually four years. *See* Md. Code (2002, 2005 Cum. Supp.), § 5-601(a), (c)(1) of the Criminal Law (I) Article ("CL"); Md. Code (1957, 1996 Repl. Vol.), Art. 27 § 287(a), (e).

4

with all but three years suspended and five years of supervised probation.

## DISCUSSION

### I. *Voir Dire* Questions

*Voir dire* is "'the process by which prospective jurors are examined to determine whether cause for disqualification exists.'" *Moore v. State*, 412 Md. 635, 644 (2010) (quoting *Dingle v. State*, 361 Md. 1, 9 (2000)). "*Voir dire* is critical to assure that the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantees to a fair and impartial jury will be honored." *Stewart v. State*, 399 Md. 146, 158 (2007) (italics added). In general, "[a]n appellate court reviews for abuse of discretion a trial court's decision as to whether to ask a *voir dire* question." *Pearson v. State*, 437 Md. 350, 356 (2014).

### A. Waiver

Before trial, appellant submitted *voir dire* questions for the Court to ask the prospective jurors. Included within his proposed *voir dire* were two questions concerning police officer testimony, which read as follows:

> 14. Would any of you be more or less likely to believe a police officer or deputy solely because he is a police officer or deputy?
>
> 15. Would any of you be more likely to believe the testimony of a police officer or deputy as opposed to that of the accused?

During *voir dire*, the trial court posed seventeen questions to the prospective jurors and then individually questioned the jurors who had responded affirmatively to any of the court's questions. The court's questions did not include appellant's Questions 14 and 15

5

("police witness questions"). At the conclusion of the questions for the entire jury pool, but before individual questioning, the court asked counsel if they wished to approach "for any reason." The prosecutor said "Yes" and addressed the court about several of his proposed *voir dire* questions that had been omitted. The court then asked, "Anything from the defense, [defense counsel]?" Defense counsel replied, "No, Your Honor." The court then asked one of the prosecutor's requested questions. After that, the court and counsel proceeded to individually question the jurors in the jury room.

Appellant argues that the trial court abused its discretion in denying his requested police witness questions, because "[w]hen requested to do so, in a case where there will be substantive testimony from police, the trial court is required to ask prospective jurors on *voir dire* whether they would favor o[r] disfavor the testimony of police officers." (Italics added). Appellant asserts that "the State's entire case rested on the testimony of police officers," and thus a new trial is warranted for failure to give the requested questions. The State concedes that, if appellant had "brought his requested 'police witness' question[s] to the attention of the trial court in a timely fashion, it would have been proper for the trial court to ask the question[s]." The State contends, however, that the trial court properly exercised its discretion in declining to ask the questions, because appellant initially gave an explicit waiver of those questions.

The first issue that this Court must address is whether appellant expressly waived his right to have the police witness questions posed to the jury venire. Maryland Rule 8-131(a) states: "Ordinarily, the appellate court will not decide any [ ] issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . ." Rule 8-

131(a) requires a defendant to make "'timely objections in the lower court,'" or "'he will be considered to have waived them and he cannot now raise such objections on appeal.'" *Breakfield v. State*, 195 Md. App. 377, 390 (2010) (quoting *Caviness v. State,* 244 Md. 575, 578 (1966)).

Maryland Rule 4-323(c) governs, among other things, objections made during *voir dire* and jury selection. The Rule provides:

> [I]t is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection at that time does not constitute a waiver of the objection.

Md. Rule 4-323(c). "We have held that it is sufficient to preserve an objection during the *voir dire* stage of trial simply by making known to the circuit court 'what [is] wanted done.'" *Marquardt v. State*, 164 Md. App. 95, 143 (quoting *Baker v. State*, 157 Md. App. 600, 610 (2004)), *cert. denied*, 390 Md. 91 (2005). "An appellant preserves the issue of omitted *voir dire* questions under Rule 4-323 by telling the trial court that he or she objects to his or her proposed questions not being asked." *Smith v. State*, 218 Md. App. 689, 700-01 (2014). If a defendant does not object to the court's decision to not read a proposed question, he cannot "complain about the court's refusal to ask the exact question he requested." *Gilmer v. State*, 161 Md. App. 21, 33, *vacated in part on other grounds*, 389 Md. 656 (2005).

7

"Generally, a waiver is the intentional relinquishment of a known right, or conduct that warrants such an inference." *Brockington v. Grimstead*, 176 Md. App. 327, 355 (2007) *aff'd*, 417 Md. 332 (2010). Waiver "extinguishes the waiving party's ability to raise any claim of error based upon that right." *Id.* "Thus, a party who validly waives a right may not complain on appeal that the court erred in denying him the right he waived, in part because, in that situation, the court's denial of the right was not error." *Id.*

In the instant case, appellant did request the police witness questions in his written proposed *voir dire*. However, after the court intentionally omitted them from the *voir dire*, appellant waived his right to the requested questions by defense counsel responding "No" to the court's request for any further comment or objection to the *voir dire* questions that had been asked. *Cf. Booth v. State*, 327 Md. 142, 180 (holding that plain error review was not required, because defense counsel "affirmatively advised the court that there was no objection to the [jury] instruction."), *cert. denied*, 506 U.S. 988 (1992). Defense counsel's response was more than "the simple lack of an objection;" he "affirmatively advised the court that there was no objection." *Booth*, 327 Md. at 180. Such statement was an "explicit waiver."

### B. Retraction of Waiver

Midway through the trial court's individual questioning of the prospective jurors, defense counsel realized that the court may not have posed his proposed police witness questions to the entire venire. The following exchange occurred:

| [DEFENSE: COUNSEL]: | Hearkening back to Juror number 27 who has been excused for cause, **that juror stated that she was not asked the police** |

**officer question, so to speak, as to whether or not she would give more or less weight to the testimony of a police or law enforcement person simply because of that status. I, frankly, sitting out there, I thought you had asked that question** in general, and right now that is sort of up in the air because it wasn't by chance asked. I think we should simply complete this process and everybody that survives we would ask them one last question. **Right now I'm not sure whether the Court asked it because she brought it up**, and she seemed to be sort of tuned in on that very issue.

**Specifically it would be my questions 14 or 15, or any combination of those, and I think they are pretty standard statewide.**

THE COURT: **I did not ask that question**, and here is the reason I did not. In light of my reading of *Pearson v. State*, the Court indicated that the judge need not ask the panel whether they know someone else who has either served as a law enforcement officer or is affiliated in some way. **However, in light of the question that I asked about any member of this panel serving as a law enforcement officer or otherwise, anyone who answered that question** and would come back here and who indicates that they have, **I do ask that question, as I did with Juror number 27**, I believe it is. Not 27, Juror number—the young man that was two years with the Ocean City Police Department.

[PROSECUTOR]: Juror 15.

9

| | |
|---|---|
| THE COURT: | Juror number 15. He is the only one that indicated he personally has served in law enforcement, and I did ask him that question. |
| [DEFENSE COUNSEL]: | Your Honor, **maybe I'm just missing something, but was a question put out there that asked a prospective juror if they would be more or less likely to believe the testimony of a law enforcement officer simply because the witness was a law enforcement officer?** I think that is more direct. |
| THE COURT: | **I did not ask that question simply because my reading of *Pearson v. State*** limits the query to questions relating to either a constitutional or statutory reason for disqualification of a juror, and **that question appears to relate more to helping an attorney**, whether it's for the State or the defense, **determine how to exercise their peremptory challenges**. |
| | If, however, an individual juror who indicates that they are a police officer comes back here and indicates that as a law enforcement officer, that they have served in that capacity, that's a question that I would ask them. |
| [DEFENSE COUNSEL]: | I am going to look over *Pearson*, but for now, **I** most respectfully take exception and **would ask that the Court hold in abeyance its final decision as to whether to propound that final question once we get a qualified group before we start exercising challenges.** Thank you, Judge. |
| [PROSECUTOR]: | Your Honor, if I can just address that. |
| THE COURT: | Certainly. |

10

[PROSECUTOR]:     First of all, as far as Juror 27, the jury sheet does indicate that the juror's spouse is a retired police officer.  So that would have been before counsel.

**As far as that particular question and the procedure for it, my concern is that that question should have been asked to the panel as a whole, not narrowing the panel down and then reasking that question, because, again, it would impact how strikes would have been exercised, and also potentially the size of the panel if we would even have a sufficient panel to choose from or would end up with a sufficient panel to choose from.**

So I think if the Court decides that question should have been asked, **I don't think we can go back and reask it at this point.**

THE COURT:       I think it's probably prudent for me to rule on the request at this point rather than to wait until after we've queried the remaining jurors.

**I am going to deny the request to pose that question to the remainder of the panel.  Some jurors have already been excused, and I do believe** for the reasons I have already stated **that the question is not really relevant with respect to strikes for cause**, and with respect to issues relating to peremptory challenges, nothing in terms of the selection process at this point means that the remaining jurors are subject to a bias on that point.  And with respect to the exercise of peremptory challenges, I believe *Pearson* quite adequately addresses that in light of

11

|  |  |
|---|---|
|  | this Court's decision not to ask that question of the entire panel. |
| [DEFENSE COUNSEL]: | **This is the Court's final ruling?** |
| THE COURT: | **That's the final ruling, yes.** |
| [DEFENSE COUNSEL]: | **I would most respectfully except. Thank you.** |

(Emphasis added).

At the time that defense counsel requested the police witness questions, the trial court had completed the individual questioning process through Juror number 30, and the court had excused ten jurors for cause.[3] Another seven jurors had mentioned possible hardships, but had not been excused. Given that there were at least fifty-nine jurors in the initial venire,[4] there were twenty jurors who had not been struck, plus twenty-nine jurors yet to be questioned at the time of defense counsel's request. The court needed twenty-eight jurors remaining after *voir dire* before beginning peremptory strikes to ensure that it would not run out of jurors.

After denying defense counsel's request for the police witness questions, the trial court then returned to questioning the remaining jurors individually. Of the next twenty-four jurors, seventeen were questioned, two of whom were struck for cause. At the conclusion of *voir dire*, but before commencing with jury selection, the court and counsel

---

[3] Nine jurors were excused during individual *voir dire* questioning and Juror number 1 was excused prior to *voir dire*.

[4] Juror number 59 is the highest referenced number in the transcript.

agreed to excuse eleven jurors based on various hardships. Thus, out of fifty-four jurors, twelve were struck for cause, eleven were excused for hardship, and thirty-one were left for jury selection.[5] The court had enough jurors after individual questioning that it did not need to individually question the remaining five jurors, Juror numbers 55 through 59.

At that time, defense counsel again raised the issue of the requested police witness questions:

| [DEFENSE COUNSEL]: | Before we go out, one last gasp from the defense on the police officer question. The defense's proposed *voir dire*. I would inquire at this point if it's not in evidence, I want to move it into evidence, and **I would ask that the Court propound question number 14, and perhaps question number 15, or a combination of them to the remaining members, and I will say no more.** |
|---|---|
| THE COURT: | Just so the record is clear, defense *voir dire* questions numbers 14 and 15, correct? |
| [DEFENSE COUNSEL]: | Yes, Your Honor. |
| THE COURT: | They read as follows: 14 reads, "Would any of you be more or less likely to believe a police officer or deputy solely because he is a police officer or deputy?" |
| | Question 15, "Would any of you be more likely to believe the testimony of a police officer or a deputy as opposed to that of the accused?" |

_____

[5] The court stated on the record that there were thirty jurors remaining, but it was actually thirty-one. The trial court seemed to have forgotten that Juror number 4 remained in the jury pool when it said that there were thirty jurors left.

13

In ruling on your question, **I am going to deny the request to pose that to the panel at this point given that when the objection was originally raised, we had already excused some jurors for cause, so the entire array was not asked that question.** However, jurors that responded to the question whether they are affiliated with a law enforcement agency or employed by a law enforcement agency, and I gave descriptions of the types of law enforcement agencies, that being a Sheriff's Office, police department, prosecutors' office, correctional facility, parole or probation agency, or any other type of law enforcement agency, and I added whether it's state or federal. That is defense's *voir dire* Question four, which was paraphrased. That question was put to the entire panel in this case.

I believe in light of *Pearson v. State*, that was sufficient to ask the panel at the outset, but the request to ask only a portion of the panel follow-up questions that had no bearing on their relationship to law enforcement or relevant to the proceedings at hand were proffered to the Court.

(Emphasis added).

Although appellant initially waived his right to the police witness questions, defense counsel later made two attempts to retract that waiver. The State argues that "the trial court was not required to allow [appellant] to retract the earlier waiver." We disagree.

14

"Ordinarily, when a party has waived a right and then retracts his waiver, the effect of the retraction is to revive the right, subject to the doctrine of equitable estoppel." *Brockington*, 176 Md. App. at 355-56. The doctrine of equitable estoppel

> "lies at the foundation of the law of waiver because estoppel arises as a result of the voluntary conduct of one party, whereby he is precluded from asserting a right as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse."

*Id.* at 356 (quoting *Arnold Bernstein Shipping Co. v. Tidewater Commercial Co.*, 84 F. Supp. 948, 952 (D. Md. 1949)). "[C]onsistent with the equitable estoppel principles, the court has discretion to reject a party's retraction of a waiver if by its timing the attempted retraction would interfere with the administration of the court's business or would amount to a trial tactic, aimed at manipulating the judicial process." *Brockington*, 176 Md. App. at 357.

The State makes several arguments for why the trial court was correct in refusing to allow appellant to retract his express waiver. We will address these arguments in turn.

**1. Effect on the use of strikes**

The State argues, as it did before the trial court, that the untimely retraction of the waiver would have affected how the prosecutor exercised his strikes. Specifically, the State contends that the prosecutor "might have chosen to oppose defense counsel's motions to excuse, or opposed the excusing of other jurors, had he known that there would be additional *voir dire* questions that could result in excusing additional member[s] of the venire panel." We are not persuaded.

15

At the time that defense counsel first asked for the police witness questions, the trial court had granted three of defense counsel's motions to excuse jurors for cause, two of which were over the State's objection. The State made no specific argument at trial about how it would have approached *voir dire* differently in this case. During *voir dire*, the prosecutor only said that, "it would impact how strikes would have been exercised."[6] The prosecutor provided nothing further beyond this ambiguous assertion. In the instant appeal, the State also does not point out any specific jurors in this case that it would have approached differently, nor identify any particular argument that it would have made. It is mere conjecture that the prosecutor may have acted differently if the prosecutor knew that the police witness questions were going to be asked later in the *voir dire* process.[7]

**2. Questioning of original venire and size of the remaining jury pool**

When the trial court denied defense counsel's request for the police witness questions, it did so saying: "I am going to deny the request to pose that to the panel at this point given that when the objection was originally raised, we had already excused some jurors for cause, so the entire array was not asked that question." The fact that some

---

[6] Peremptory strikes were not being exercised at that point. Jurors were only being excused for cause.

[7] The State also argues that a late inclusion of the police witness questions would give appellant an advantage, "because the trial court may have been less inclined to grant [appellant's] earlier motions to strike for cause had he raised [the police witness questions] in a timely fashion." This argument fails, because the trial court never stated, nor implied, that it would have been less inclined to grant appellant's motions to strike two jurors for cause over the State's objection if the police witness questions had been given at the beginning.

16

jurors had already been excused without hearing the police witness questions is irrelevant, because those jurors were struck for cause on other grounds. Therefore, their answers to police witness questions would not have mattered.

Additionally, the State argues that having a sufficient pool of jurors was a concern. The trial court, however, never mentioned that as a reason for denying the request. Nevertheless, the record shows that there were plenty of jurors available. The jury pool was large enough that the trial court was able to excuse eleven jurors for hardship after the individual *voir dire* questioning had concluded. Moreover, the court stopped short of interviewing every juror individually, because by the time the court had questioned through Juror number 54 out of a venire of at least fifty-nine, there were enough jurors to begin peremptory strikes. The size of the jury pool at the time that the issue of the police witness questions was raised was more than sufficient to allow for the questions to be asked without a fear of running out of jurors.

### 3. Manipulation of the judicial process

The State cites to fears over "gamesmanship" and trial tactics that are "aimed at manipulating the judicial process." *Brockington*, 176 Md. App. at 357. The actions of defense counsel in this case suggest nothing of the sort. On the contrary, defense counsel clearly wanted the police witness questions included in the *voir dire*, given their inclusion in his proposed *voir dire* that was submitted to the court at the beginning of the trial. Furthermore, it would appear that the lack of an initial objection from defense counsel was a simple oversight on counsel's part. Juror number 27 noted that a police witness question had not been asked and then added that she would be biased in favor of the

17

testimony of police officers. Because of Juror number 27's statement, defense counsel raised the issue of the police witness questions. Defense counsel stated to the court: "I thought you had asked that question."

There is nothing in the record to suggest that counsel was attempting to game the system by waiting until midway through *voir dire* to request the police witness questions. A reasonable defendant in appellant's shoes would want to know if jurors were biased in favor of the testimony of police officers. Withholding those questions for part of the *voir dire* process would only put appellant at risk. It is clear from the record that defense counsel mistakenly thought that the police witness questions had been given from the outset, and only brought the issue up later when he was alerted by a juror that the questions had not been posed to the venire. This is not a case in which the retraction of appellant's waiver would have constituted "manipulating of the judicial process." *Id.*

In sum, because the retraction of appellant's waiver (1) would not have prevented the selection of a jury from the venire remaining at the time of the retraction, (2) would not have prejudiced the State in its approach to *voir dire,* and (3) would not have amounted to a trial tactic "aimed at manipulating the judicial process," we conclude that the trial court abused its discretion in not permitting such retraction. *See id.* Given that appellant should have been allowed to retract his waiver, we must now determine whether the court abused its discretion in refusing to ask the police witness questions.

### C. Mandatory *Voir Dire* Questions

"In Maryland, the sole purpose of *voir dire* is to ensure a fair and impartial jury by determining the existence of cause for disqualification, and not as in many other states, to

include the intelligent exercise of peremptory challenges." *Stewart*, 399 Md. at 158.

"The manner of conducting *voir dire* and the scope of inquiry in determining the

eligibility of jurors is left to the sound discretion of the judge." *Washington v. State*, 425

Md. 306, 314 (2012) (italics added). Trial courts may decline to ask *voir dire*

"[q]uestions which are not directed at a specific ground for disqualification, which are

merely 'fishing' for information to assist in the exercise of peremptory challenges, which

probe the prospective juror's knowledge of the law, ask a juror to make a specific

commitment, or address sentencing considerations." *Id.* at 315. The Court of Appeals

has

> identified two broad areas of inquiry that may reveal cause for a
> juror's disqualification: (1) examination to determine whether the
> prospective juror meets the minimum statutory qualifications for
> jury service, and (2) examination to discover the juror's state of
> mind as to the matter in hand or any collateral matter reasonably
> liable to have undue influence over him.

*Id.* at 313. The latter category consists of "'biases directly related to the crime, the

witnesses, or the defendant.'" *Id.* at 311 (quoting *Dingle v. State*, 361 Md. 1, 10 (2000)).

The Court of Appeals has held that, "where a principal part of the State's evidence

is testimony of a police officer diametrically opposed to that of a defendant," it was

reversible error for the trial court to refuse to ask: "Is there anyone here who would give

more credit to the testimony of a police officer over that of a civilian, merely because of

his status as a police officer?" *Langley v. State*, 281 Md. 337, 338, 349 (1977). In *Bowie*

*v. State*, the Court went further and held that it was reversible error for trial court to

refuse to ask: "Do you believe that a police officer will tell the truth merely because he or

19

she is a police officer?" and "Would any of you be more or less likely to believe a police officer than a civilian witness, solely because he or she is a police officer?"[8] 324 Md. 1, 6, 11 (1991). The Court in *Bowie* held that *Langley* was dispositive, even though in *Bowie*, the defendant did not testify at trial and thus there was no testimony "diametrically opposed" to the officers' testimony. *Id.* at 9-10. "At the heart of the issues presented in *Langley* [and] *Bowie* . . . is whether it is appropriate for a juror to give credence to a witness simply because of that witness's occupation, or status, or category, or affiliation." *Moore*, 412 Md. at 652 (internal quotation marks omitted). Thus Maryland caselaw has established that, when there are police officer witnesses for the State, police witness questions requested by a defendant are mandatory. *See Bowie*, 324 Md. at 11; *Langley*, 281 Md. at 349.

The *Pearson* case relied upon by the trial court stands for the proposition that

> where all of the State's witnesses are members of law enforcement agencies and/or where the basis for a conviction is reasonably likely to be the testimony of members of law enforcement agencies, on request, a trial court must ask during *voir dire*: "Have any of you ever been a member of a law enforcement agency?"

*Pearson*, 437 Md. at 367. The Court in *Pearson* also held that, upon request, a trial judge must ask: "Do any of you have strong feelings about [the crime with which the defendant is charged]?" *Id.* at 363 (alterations in original). Finally, the Court in *Pearson* held that it was not an abuse of discretion for the trial judge not to ask whether any prospective

---

8 The *Bowie* Court also held that it was reversible error for the trial court to refuse to ask: "Would any of you tend to view the testimony of witnesses called by the Defense with more skepticism than witnesses called by the State, merely because they were called by the Defense?" *Bowie*, 324 Md. at 6, 11.

juror has been the victim of a crime. *Id.* These holdings in *Pearson* do not affect the mandatory police witness questions as established by *Langley* and *Bowie*. Therefore, the trial court in the instant case abused its discretion by refusing to give the police witness questions requested by appellant. This is reversible error.

## II. Admission of Alleged Prior Bad Act

During the trial, defense counsel objected when the prosecutor asked Deputy Young why he went to a particular address:

| | |
|---|---|
| [PROSECUTOR]: | Now, directing your attention to August 1, 2011, did you happen to go to 203 Oak Leaf Circle in Abingdon? |
| [YOUNG]: | I did. |
| [PROSECUTOR]: | And why did you go there? |
| [YOUNG]: | There was a call for service at that location for a domestic disturbance. |
| [DEFENSE COUNSEL]: | Objection, Your Honor. |
| THE COURT: | Approach, please. |

When the parties approached the bench, the following exchange occurred:

| | |
|---|---|
| [DEFENSE COUNSEL]: | Relevance and prejudice. A call for service, doesn't have to say what it was there for because there was nothing that ever came of it. It just brings in prejudice before the jury. |

21

THE COURT:  You certainly have the opportunity to cross-examine him, but it is precluded under the rules.[9]

Appellant argues that Deputy Young's testimony—that he responded to 203 Oak Leaf Circle the night before the search warrant was executed because of a service call for a "domestic disturbance"—was a prior bad act that does not fit any exception to the Rule 5-404(b) prohibition on prior bad act evidence. Appellant claims that this testimony "maintained absolutely no link to the crime with which [a]ppellant was charged." Appellant concludes that the testimony was only included "to intimate to the jury that [a]ppellant was a troublemaker and violent person."

The State responds that, because appellant made a specific objection at trial on different grounds, relevance and prejudice, this issue is not preserved for appellate review. The State further contends that, even if the issue is preserved, appellant's argument still fails, because the testimony was not prior bad act evidence regarding appellant. The State maintains that a "'domestic disturbance,' without more detail or specificity, does not come within the category of [other] 'crimes, wrongs, or acts.'" Even if the testimony was prior bad act evidence, the State points out that there was no indication that appellant was in any way involved in the "domestic disturbance."

"The admission of other crimes evidence is vested within the sound discretion of the trial court and we will not overrule the decision of the trial court unless there has been

_____

[9] The trial court said "it is precluded under the rules." It would seem that this is either a mistake in the transcript or a misstatement from the court. The record shows that the court allowed the testimony.

22

an abuse of discretion." *Jackson v. State*, 132 Md. App. 467, 485-86, *cert. denied*, 360 Md. 487 (2000).

Maryland Rule 5-404(b) provides:

> Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

"'There are few principles of American criminal jurisprudence more universally accepted than the rule that evidence which tends to show that the accused committed another crime independent of that for which he is on trial, even one of the same type, is inadmissible.'" *State v. Taylor*, 347 Md. 363, 369 (1997) (quoting *Cross v. State,* 282 Md. 468, 473 (1978)). This evidence is excluded out of the fear that a jury may convict a defendant "not because it has found the defendant guilty of the charged crime beyond a reasonable doubt, but because of the defendant's unsavory character or criminal disposition as illustrated by the other crimes evidence." *Streater v. State*, 352 Md. 800, 810 (1999). "[A] bad act is an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Klauenberg v. State*, 355 Md. 528, 549 (1999).

This Court agrees with the State that a mere reference to a "domestic disturbance," without more detail, does not come within the definition of other "crimes, wrongs, or acts." There was nothing in the record showing what the alleged "act" was, only that there was a "domestic disturbance." Furthermore, the alleged act was not tied to any

23

particular person in this case. The testimony given by Deputy Young did not indicate that appellant was in any way involved in the domestic disturbance. According to Deputy Young, he was called to 203 Oak Leaf Circle for the domestic disturbance. Appellant resided in Apartment L at 203 Oak Leaf Circle. No further evidence was adduced on that domestic disturbance. The trial court did not err or abuse its discretion in admitting Deputy Young's testimony.

### III. Sufficiency of the Evidence

> The standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We view the evidence in the light most favorable to the prosecution. We give due regard to the fact finder's finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses. Although our analysis does not involve a re-weighing of the evidence, we must determine whether the jury's verdict was supported by either direct or circumstantial evidence by which any rational trier of fact could find [appellant] guilty beyond a reasonable doubt . . . .

*Moye v. State*, 369 Md. 2, 12-13 (2002) (citations and internal quotation marks omitted).

Appellant argues that "the evidence was insufficient to sustain a conviction for illegal possession of a regulated firearm because the State introduced no evidence that appellant had knowledge that he was disqualified from possessing a firearm." Appellant contends that the State "was required to prove that [a]ppellant possessed the firearm, knowing that he was disqualified from the possession."

The State points out that appellant cites no caselaw "indicating that ignorance of the law is a defense to this charge." The State also argues that the record permits a

24

reasonable inference that appellant knew that he was not permitted to possess a regulated firearm, given that appellant had two CDS-related convictions and acquired the handgun in a trade with a crack cocaine addict. Finally, the State contends that appellant's admission that he wiped the gun down is evidence of consciousness of guilt.

We must first determine whether there is a knowledge of disqualification element to the subject offense as argued by appellant. The crime of illegal possession of a regulated firearm is codified in Section 5-133(b)(1) of the Public Safety Article, which provides that "a person may not possess a regulated firearm if the person: [ ] has been convicted of a disqualifying crime." Md. Code (2003, 2011 Repl. Vol., 2015 Cum. Supp.), § 5-133(b)(1) of the Public Safety Article ("PS"). The penalty provision for a violation of Section 5-133(b) is set forth in Section 5-144, which states:

(a)     *Prohibited*—Except as otherwise provided in this subtitle, a dealer or other person may not:

(1)     knowingly participate in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subtitle; or

(2)     knowingly violate § 5-142 of this subtitle.

(b)     *Penalty*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

(c)     *Separate crime*—Each violation of this section is a separate crime.

PS § 5-144.

25

"The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991). "While ignorance of fact may sometimes be admitted as evidence of lack of criminal intent, ignorance of the law ordinarily does not give immunity from punishment for crime, for every man is presumed to intend the necessary and legitimate consequences of what he knowingly does." *Hopkins v. State*, 193 Md. 489, 498-99 (1949), *appeal dismissed*, 339 U.S. 940 (1950).

Under the express language of the statute, a defendant may not "knowingly participate in . . . possession . . . of a regulated firearm." PS § 5-144(a)(1). There is no language in the statute requiring a defendant to know that he is disqualified. In *McNeal v. State*, this Court held that, to satisfy the *mens rea* requirement for a violation of Section 5-133, the State was required to prove only that defendant knew that he was in possession of a handgun. 200 Md. App. 510, 524 (2011), *aff'd*, 426 Md. 455 (2012). The facts of the instant case clearly satisfy such requirement, because appellant admitted to Agents Boroshok and Tolomeo that "he acquired the handgun from what he termed a junkie in the White Marsh area. That he made a trade for an eight ball of crack cocaine for it."

In addition, even if knowledge of disqualification is required, the evidence adduced by the State at trial supports a rational inference that appellant knew that he was not permitted to possess the handgun. The State correctly states that "[t]he jury could reasonably infer that, given [appellant's] two CDS-related convictions, and the fact [that] he traded CDS for the gun, that he was aware that he was not permitted to possess the gun." A jury also could infer that appellant knew that he could not possess the handgun

26

because of his admission to Agents Boroshok and Tolomeo that he had wiped down the gun. Viewing the evidence in a light most favorable to the State, there was sufficient evidence to convict appellant.

### IV. Probable Cause for the Traffic Stop

In reviewing the denial of a motion to suppress, we rely solely on the record developed at the suppression hearing. *State v. Green*, 375 Md. 595, 607 (2003). "[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion . . . ." *State v. Rucker*, 374 Md. 199, 207 (2003). "We defer to the trial court's fact-findings at the suppression hearing unless the findings were clearly erroneous." *Turkes v. State*, 199 Md. App. 96, 113 (2011). "The suppression hearing court's legal determinations, unlike its fact-findings, are paid no deference on review." *Id.*

The Fourth Amendment to the U.S. Constitution protects against unreasonable government searches and seizures. U.S. Const. amend. IV. A traffic stop involving a motorist is a detention that implicates the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Green*, 375 Md. at 609. Such a stop does not initially violate the Fourth Amendment if a police officer has probable cause to believe that the driver has committed a traffic violation, *see Whren v. United States*, 517 U.S. 806, 810 (1996), or if an officer has reasonable, articulable suspicion that "criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Section 21-604(c) of the Transportation Article provides:

> *Signal required prior to turning vehicle*—A person may not, if any other vehicle might be affected by the movement, turn a vehicle until he gives an appropriate signal in the manner required by this subtitle.

Md. Code (2012), § 21-604(c) of the Transportation (III) Article ("Transp").

Appellant argues that the traffic stop conducted by Deputy Jackson was unreasonable, because Deputy Jackson did not testify that there were any other motorists in appellant's vicinity who could have been affected by his turn.[10] According to appellant, the statute requires proof that another vehicle might have been affected by appellant's turn in order for his failure to use a turn signal to qualify as a traffic violation. Because Deputy Jackson provided no testimony of the presence of other vehicles or how far his police vehicle was from appellant when he made the turn, appellant concludes that the traffic stop was illegal, and the handgun magazine discovered as a result of the stop, which formed part of the factual basis for the search warrant, should have been suppressed as fruit of the poisonous tree.

The State responds that Deputy Jackson's testimony—that appellant turned "all of a sudden," which "kind of took [Deputy Jackson] off balance"—was sufficient to satisfy the statute's requirement that "any other vehicle might be affected by the movement." The State points out that the statute says "any other vehicle," and not "any other vehicle *besides a police vehicle*." (Emphasis in original). The State also asserts that Deputy

---

[10] Appellant argues that Deputy Jackson did not have "reasonable articulable suspicion" that appellant committed a traffic violation. Because Deputy Jackson pulled appellant over for a traffic violation, probable cause is the correct standard under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 810 (1996).

Jackson testified that he was "directly behind" appellant and only a "car length" away at the time of the turn.

Appellant cites to *Best v. State*, 79 Md. App. 241, *cert. denied*, 317 Md. 70 (1989), for support. Appellant's reliance on *Best* is misplaced. In that case, Best's car was stopped after a police car observed the appellant make a turn without using a signal. *Id.* at 247. In ruling against Best, this Court stated:

> [Best] argues that the State failed to show that the police car might have been affected by the movement. The argument is that unless the State has affirmatively proved that another vehicle is actually following the turning vehicle and following closely enough to be adversely affected by the absence of the signal, the State has failed to prove the condition precedent for the requirement that the warning be given. Such is far too narrow a reading of the traffic law, which deals with left-hand turns and right-hand turns alike and which is intended to alert other vehicles in the vicinity coming in from all points of the compass. **[The trial court] ruled, quite properly we hold, that the requirement to signal a turn is intended to benefit all other vehicles in the area, whether such vehicles are following the turning vehicle, approaching the turning vehicle from the front, or moving in upon the turning vehicle from an intersecting highway.**

*Id.* (emphasis added). Appellant claims *Best* is distinguishable from the instant case, because in *Best*, the police cruiser was following directly behind Best when he made the turn.

Contrary to appellant's contention, Deputy Jackson testified that he was directly behind appellant at a distance of about one car length when appellant made a turn without giving an appropriate signal. Furthermore, Deputy Jackson testified that appellant's turn "kind of took [him] off balance." Deputy Jackson's testimony comports precisely with this Court's holding in *Best* and provides sufficient evidence of a traffic violation under

29

Section 21-604(c), thus giving the deputy probable cause for the traffic stop. *See Best*, 79 Md. App. at 247; Transp. § 21-604(c).  The trial court correctly denied appellant's motion to suppress.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR A NEW TRIAL; COSTS TO BE PAID BY HARFORD COUNTY.**